UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
IN RE WORLD TRADE CENTER DISASTER SITE
LITIGATION
------------------------------------------------------------------------X
LARRY KREPELA AND JOAN KREPELA,

|  |  |
|---|---|
| Plaintiffs, | COMPLAINT |
|  | Jury Trial Demanded |
| -against- | 21 MC 100 (AKH) |

THE CITY OF NEW YORK, ET AL.,

Defendants.
------------------------------------------------------------------------X

The Plaintiff (and the Derivative Plaintiff), by their attorneys, state and allege the

following upon information and belief against Defendant(s):

## I.   INTRODUCTION

1.      The Plaintiff (and, if applicable, Derivative Plaintiff) bring this action against

Defendant(s) seeking redress for injuries he (she) (they) has (have) suffered in the past and will

continue to suffer, as a result of Defendant's (Defendants') reckless, grossly negligent and

negligent operation, ownership, maintenance, control, supervision and management of the

premises located at one or more of the locations outlined in Case Management Order 3 ("CMO

3") and other structures and their environs, collectively and hereinafter known as the "World Trade

Center Site," following the terrorist attacks of September 11, 2001 ("the Attacks").   The

Defendant(s) their servant(s), agents(s), lessee(s), permitee(s), contractor(s) and/or employee(s),

entered into an agreement or agreements relative to certain work, labor and services, such as

construction, excavation, demolition, fire control, crowd control, cleanup and/or repair(s) to be

performed at the World Trade Center Site in the aftermath of the Attacks (hereinafter referred to as

"Work").

2.     Because of the damage sustained in the attacks, the buildings known as "One World Trade Center" and "Two World Trade Center" (collectively the "Twin Towers") and Seven World Trade Center collapsed, spreading known and unknown toxic substances throughout the World Trade Center Site and the surrounding areas, portions of which, although operated, owned, maintained, controlled, supervised and managed by the Defendant(s), remained dangerous, defective, hazardous, toxic, unguarded, unsupervised and unprotected for multiple days, weeks and/or months thereafter. The Plaintiff participated in rescue and/or recovery and/or construction, excavation and/or demolition operations at the World Trade Center Site and/or other buildings or locations or portions thereof, on or about September 11, 2001 and during the days, weeks and/or months that followed.

3.     This action is to recover money damages for the personal injuries and/or death, pain and suffering, loss of income, medical expenses and other damages sustained by the Plaintiff and, if applicable, the resultant loss of services, society, love, consortium and support sustained by his/her spouse as a result of the carelessness, recklessness and negligence of the Defendant(s), its (their) agent(s), servant(s) and/or employee(s), in failing to provide the Plaintiff with a safe place to work at the World Trade Center Site and/or other buildings or locations or portions thereof and in failing to provide the Plaintiff with proper and appropriate respiratory protection and protection from exposure to toxins, fumes, substances, debris, chemicals and/or radiation, including but not limited to protection in the form of: protective masks, safe work equipment and decontamination equipment, during the time that the Plaintiff participated in rescue and/or recovery and/or  construction, excavation and/or demolition operations at the World Trade Center Site and/or other buildings or locations or portions thereof, operations that commenced on or about September 11, 2001 and continued for many months thereafter.

4.      The Plaintiff also seeks recovery for Defendant's (Defendants') failure to provide proper and appropriate respiratory protection and proper and appropriate protective clothing and equipment and for failing to properly monitor air quality and for failing to properly notify him/her of the dangerous levels of toxins and contaminants in the air at and around the World Trade Center Site and/or other buildings or locations or portions thereof and for the Defendant's (Defendants') failure to comply with one or more of the following: the Labor Law of the State of New York, the New York State Industrial Code and the requirements of the Occupational Safety & Health Administration, other applicable federal, state and local statutes, law, rules, regulations and ordinances.

5.      As a result of the foregoing and at all relevant times, the Plaintiff(s) was exposed to toxins, contaminants and other harmful airborne products at the World Trade Center Site and/or other buildings or locations or portions thereof, such as fiberglass, glass, silica, asbestos, lead, benzene, organic matter and other hazardous chemicals, substances and elements.  As a consequence of said exposures, the Plaintiff(s) was (were) injured.

6.      Defendant(s) is (are) thereby liable pursuant to New York General Municipal Law §205-a and/or New York General Municipal Law §205-e, for the failure to comply with the applicable provisions of one or more of the following: the Occupational Safety & Health Act, the U.S. Department of Welfare, the Industrial Code and other applicable federal, state and local statutes, law, rules, regulations and ordinances, set forth more fully herein.

7.      This action arises under one or more of the following: the Occupational Safety & Health Standards as promulgated by the Occupational Safety and Health Administration, including, but not limited to: Article 1926, 29 U.S.C. Sections 654 *et. seq.*; the provisions of 29 C.F.R. §1910.38, §1910.132-134, §1910.146, §1910.120; §1910.156; §1910.1001, §1910.1025,

§1910.1027, §1910.1000 and §1910.1200; the provisions of the U.S. Department of Welfare;

New York State Labor Law, including, but not limited to: §200, §240 and §241(6); Article 2,

§27-a, Article 28, §878; 12 NYCRR §820.4 and §23-1.8; The Industrial Code, including, but not

limited to: §23-1.5, §23-1.7, §23-1.8, §23-1.9, §23-1.25, §23-1.26, §23-2.1; New York State

General Municipal Law §205-a and/or §205-e; and other applicable rules, regulations and

statutes.

## II.   JURISDICTION

8.      The United States District Court for the Southern District of New York has original

jurisdiction over the Plaintiffs' (Plaintiff's) claims pursuant to §408(b)(1) of the Air Transportation

Safety & System Stabilization Act of 2001, 49 U.S.C. §40101 ("ATSSSA").

9.       Plaintiff's action is not time barred based upon the provisions of CPLR 214(c).

10.     This Cause of Action is brought pursuant to the amendment of GML § 50-i to

include subdivision 4, allowing for the commencement of an "action against a public corporation

for injuries suffered by a participant in World Trade Center rescue, recovery or cleanup

operations as a result of such participation" within one year of the amendment's effective date,

*i.e.,* September 16, 2009.

## III.   VENUE

11.     Pursuant to ATSSSA §408(b)(1), venue is proper in this judicial district.

## IV.   PARTIES

### A. PLAINTIFF(S)

12.     Plaintiff did, at all relevant times, participate in rescue and/or recovery and/or

construction, excavation and/or demolition operations at the World Trade Center Site and/or

other buildings or locations or portions thereof, on or about 9/12/2001 and during the days,

4

weeks and/or months that followed during the course of his/her employment until on or about

2/28/2002.

13.    The Plaintiff sustained physical and other injuries in consequence of his exposure

to toxins, contaminants and other harmful airborne products at the World Trade Center Site

and/or other buildings or locations or a portion thereof, during his/her participation in the rescue

and/or recovery and/or construction, excavation and/or demolition operations.  The following

person(s) is (are) a Plaintiff (Plaintiffs) in this action:

>    a.    Plaintiff, LARRY  KREPELA (hereinafter the "Injured Plaintiff"), is an
>          individual and a citizen of New York residing at 17 Kingston Road, Mt.
>          Sinai, NY  11766-.
>
>                            (OR)
>    b.    Alternatively, _____ is the _____/Executric of Decedent
>          _____ and brings this claim in his (her) capacity as  of the Estate
>          of _____.
>
>    c.    Plaintiff, _____  (hereinafter the "Derivative Plaintiff'), is a citizen of
>          New York residing at _____ and has the following
>          relationship to the Injured Plaintiff: SPOUSE at all relevant times herein,
>          is and has been lawfully married to Plaintiff _____ and brings
>          this derivative action for her (his) loss due to the injuries sustained by her
>          husband (his wife), Plaintiff _____.

14.    In the period from 9/12/2001 to 2/28/2002 the Injured Plaintiff worked for Fire

Department New York (FDNY) as a Lieutenant at:

================================
☑ The World Trade Center Site
Location(s) (*i.e.,* building, quadrant,
etc.)_____

_____
_____
From on or about 9/12/2001 until 2/28/2002;
Approximately 8 hours per day; for
Approximately 30 days total.
================================
☐ The New York City Medical Examiner's
Office

From on or about _____ until

_____,
Approximately _____ hours per day; for
Approximately _____ days total.
================================
☐ The Fresh Kills Landfill
From on or about _____ until

_____;
Approximately _____ hours per day; for
Approximately _____ days total.

===============================          ===============================
                                                          ☑ The Barge

From on or about <u>To Be Provided</u> until <u>To Be Provided</u>;

Approximately  hours per day; for Approximately  days total.

===============================

☐ **Other:**\* For injured plaintiffs who worked at Non-WTC Site building or

location. The injured plaintiff worked at the address/location, for the dates alleged, for the hours per day, for the total days and for the employer, as specified below:

From on or about _____ until _____; Approximately _____ hours per day; for Approximately _____ days total; Name and Address of Non-WTC Site Building/Worksite:

_____

____

### A. Defendant

#### i. THE CITY OF NEW YORK

1.       Upon information and belief, at all relevant times, Defendant THE CITY OF NEW YORK (the "CITY") is/was a municipal corporation duly organized and existing under, pursuant to and by virtue of the laws of the State of New York.

2.       With respect to the conditions precedent to the commencement of an action as set forth in General Municipal Law Section 50(i), the Plaintiff(s) herein

    a.    has (have) complied with the amendment of GML § 50-i to include subdivision 4, allowing for the commencement of an "action against a public corporation for injuries suffered by a participant in World Trade Center rescue, recovery or cleanup operations as a result of such participation" within one year of September 16, 2009.

## I.   GENERAL ALLEGATIONS

3.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s) owned the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

4.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was a (were) servant(s), agent(s), employee(s), lessee(s), permittee and/or contractor of the owner of the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

5.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was (were) the lessee(s) of the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

6.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was (were) the lessor(s) of the World Trade Center Site and/or other buildings or locations portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

7.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was (were) the general contractor and/or construction manager responsible for the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

8.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was (were) the subcontractor responsible for the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations as or portions thereof.

9.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), was (were) the supervisor responsible for the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

10.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), operated the World Trade Center Site and/or other buildings or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

11.      At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), maintained the World Trade Center Site and/or other

buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

12.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), managed the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

13.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), controlled the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

14.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), inspected the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or or portions thereof.

15.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), entered into an agreement (agreements) relative to the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

16.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), employed construction managers, general contractors and subcontractors responsible for the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

17.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), hired and/or retained Plaintiff's employer to perform Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

18.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), obtained a permit for the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

19.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), performed the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

20.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), directed the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or portions thereof.

21.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), supervised the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or portions thereof.

22.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to keep the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

23.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to supervise the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

24.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to operate the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

25.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to maintain the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

26.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to manage the World Trade Center Site and/or other buildings or locations a portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

27.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to control the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

28.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to inspect the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site

and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

29.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to monitor the air quality and the dust to which Plaintiff(s) would be exposed while performing the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

30.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to direct the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

31.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to construct, reconstruct, excavate, rehabilitate and/or alter the World Trade Center Site and/or other buildings or locations or a portion thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

32.     At all relevant times, it was the duty of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to act in "good faith" in carrying out their duties and obligations, both contractual and statutory, to the Plaintiffs herein.

33.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to act in "good faith" in carrying out their duties and obligations, both contractual and statutory, to the Plaintiffs herein.

34.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to warn any and all persons, including the Plaintiff(s), lawfully engaging in the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, that the World Trade Center Site and/or other buildings or locations portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, is/was not in reasonably safe and suitable condition and repair, is/was dangerous, hazardous, ultra hazardous and/or includes (included) handling, inhaling and/or contacting dust, toxic, deleterious and/or harmful elements.

35.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to implement and to enforce guidelines for the safety of those engaged in the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

36.     At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to keep the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

37.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to supervise the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

38.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to operate the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

39.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to maintain the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

40.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to manage the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site

and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

41.     At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to control the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

42.     At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to inspect the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

43.     At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to monitor the air quality and the dust to which Plaintiff(s) would be exposed while performing the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

44.     At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to direct the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site

and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

45.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to construct, reconstruct, excavate, rehabilitate and/or alter the World Trade Center Site and/or other buildings or locations or a portion thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, in reasonably safe and suitable condition, repair and manner, free from any and all dangerous and/or hazardous condition(s).

46.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to warn any and all persons, including the Plaintiff(s), lawfully engaging in the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, that the World Trade Center Site and/or other buildings or locations or portions thereof, the work site, the Work and/or the apparatus provided and utilized in connection with the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, is/was not in reasonably safe and suitable condition and repair, is/was dangerous, hazardous, ultra hazardous and/or includes (included) handling, inhaling and/or contacting dust, toxic, deleterious and/or harmful elements.

47.    At all relevant times, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to implement and to enforce guidelines for the safety of those engaged in the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

48.     Following the terrorist attacks of September 11, 2001, the air and the area in, around, on and at the World Trade Center Site and/or other buildings or locations or portions thereof, was polluted and contaminated with toxic particles, dust, aerosols, vapor, fibers, materials and fluids ("Dust").  These include asbestos, lead and mercury from items such as personal computers, mainframe computers and copy machines; mercury from fluorescent lights; plastics, polyvinyl chloride insulations of cables, nylon carpeting and other materials containing and/or producing dioxins and other harmful materials when burned; benzene from the jet fuel and other petroleum products stored in the towers; lead ammunition from the on-site Secret Service shooting range; and arsenic, lead, mercury and chromium stored in the U.S. Customs laboratory.

49.     The levels and types of human exposures resulting from this mixture of materials, dust, toxins and a smoldering fire that lasted more than three months and reached temperatures as high as 1800° Fahrenheit was unprecedented.[1]  Dust and vapors blanketed work site, as well as, the entire area surrounding the World Trade Center Site.  The ongoing fires burning at the World Trade Center Site and/or other buildings or locations or portions thereof, produced a mixture of toxic gasses and ultra-fine particulates that had never before been seen.  Air samples taken from a rooftop one mile north of the World Trade Center Site and/or other buildings or locations or portions thereof, showed "unprecedented ambient levels" of fine particulate matter, sulfur, acidic aerosols, heavy metals and other dangerous compounds.[2]

---

[1] Paul J. Lioy, "Characterization of the Dust/Smoke Aerosol that Settled East of the World Trade Center in Lower Manhattan After the Collapse of the WTC 11 September, 2001, "*Envtl. Health Perspectives* 110(7):703-14 (July 2002), p. 703.

[2]Thomas Cahill, *et al*., "Analysis of Aerosols from the World Trade Center Collapse Site, New York October 2 to October 30, 2001." *Aersol Sci., & Tech.* 38:165-183 (2004) p. 182; Laurie Garrett, "A 'Chemical Factor' in Skies," *New York Newsday* (September 11, 2003).  Dr. Cahill took more than 8,000 air samples, starting October 3, 2001, from a rooftop on Varick Street in Manhattan.

50.     Shortly after September 11, 2001, tests conducted by the United States Geological Survey ("USGS") determined that the dust at the World Trade Center Site and/or other buildings or locations or portions thereof, was highly caustic and thus capable of burning moist tissue in the throat, eyes and nasal passage.  This dust was determined to have a pH value of 9.0 to 11.0, indicating that the dust was highly alkaline and comparable to ammonia.  Some of the dust samples taken by the USGS on September 17-18, 2001, registered higher than 11.0 on the pH scale—as caustic as liquid drain cleaners.[3]

51.     Days after September 11, 2001, the New York Environmental Law & Justice Project sent Dust samples from several lower Manhattan locations to two respected laboratories. One such sample showed a 90% fiberglass content.[4]  Fiberglass consists of glass fibers that are small enough to be inhaled and cause respiratory irritation in humans and fibrosis (a scaring or thickening of tissues deep in the lung, impairing respiration) in animals.  Glass fibers are also highly irritating to the eyes.

52.     The New York City Department of Environmental Protection ("NYDEP") conducted numerous tests that determined that the air and World Trade Center Site and/or other buildings or locations or portions thereof, was contaminated and polluted with the aforementioned toxic Dust.  Notwithstanding the results of these tests, the NYDEP advised workers including Plaintiff(s) that the air in and around the World Trade Center Site and/or other buildings or portions thereof, was safe for the Plaintiff(s) to inhale, ingest, contact, absorb and touch.

---

[3] Roger Clark, *et al*., "Environmental Studies of the World Trade Center Area After the September 11, 2001 Attack" (USGS Open File Report OFR-01-0129) (http://pubs.usgs.gov/of/2001/ofr-01-0429/>), p.4; Philip Landrigan, M.D., *et al*., "Heath and Environmental Consequences of the World Trade Center Disaster, "*Envtl Health Perspectives* 112(6):73139, 732 (May 2004), at p.16.

[4] Juan Gonzalez, "Health Hazards in Air Worry Trade Center Workers," *Daily News* (September 28, 2001); Juan Gonzalez, *Fallout*., p. 6.  The sample was taken at the corner of Church and Vesey Streets, at the northeast corner of the WTC Site.

53.     Testing and monitoring methods on and around the WTC site were incorrectly analyzed and evaluated by the use of averaging the test levels obtained from various locations in and around the "pile."  Hazardous waste sites are properly evaluated with respect to human exposure potential at "hot spots," not the average of samples or samples from the perimeter or off-site locations.  The analytical data, when properly evaluated, reveals that there were sufficiently high levels of total volatile organic compounds and benzene as to be far beyond the limits of a cartridge respirator and to require, instead, self-contained breathing apparatus (SCBA).  On site benzene levels alone were sufficient to require the use of OSHA level A or B protective equipment including self-contained breathing apparatus and respirator fit tests. Workers should have been fully encapsulated without dermal exposures to PAH and dioxin-containing dust, both of which are absorbed through the skin.

54.     In addition to SCBA, proper OSHA-compliant fit testing and total body encapsulation, appropriate site-specific health and safety briefings should have been conducted at the earliest possible time to educate workers with respect to the chemical carcinogens present and the means to eliminate and/or minimize further exposures including, but not limited to: full decontamination procedures, elimination of hand-mouth activity, eating or drinking prior to decontamination and the hazards associated with the use of saturated respirator cartridges in benzene environments at levels of 180,000 ppb.  OSHA methods dictate that slip-on respirator masks are only designed to provide a 10-fold reduction in exposure.

55.     Respirator fit testing done at and around the WTC site was illusory, at best.  The fit testing performed at and around the site for WTC site workers did not meet OSHA standards.

56.     The information about the dangers that actually existed at the World Trade Center Site and/or other buildings or locations or portions thereof, was not provided to treating

physicians or to the rescue, recovery, inspection, repair, or fire, police, or construction workers at the World Trade Center Site and/or other buildings or locations..

57.     By reason of the foregoing, the Plaintiff(s) was (were), at all relevant times, exposed to toxins, Dust, contaminants and other harmful airborne products at the World Trade Center Site and/or other buildings or locations or a portion thereof, such as fiberglass, glass, silica, asbestos, lead, benzene, organic matter and other hazardous chemicals, substances and elements.

58.     In consequence of said exposure(s), the Plaintiff was seriously injured as demonstrated in the following chart:

| | | | |
|---|---|---|---|
| ☐ | Cancer Injury: N/A.<br>Date of onset: _____<br>Date physician first connected this injury to WTC work: _____ | ☑ | Cardiovascular Injury: Cardiac Problems<br>Date of onset: 3/23/2004<br>Date physician first connected this injury to WTC work: 4/12/2007 |
| ☑ | Respiratory Injury: Asthma; Obstructive Airway Disease; and RADS<br>Date of onset: 10/10/2006<br>Date physician first connected this injury to WTC work: 4/12/2007 | ☑ | Fear of Cancer<br>Date of onset: 4/12/2007<br>Date physician first connected this injury to WTC work: To be supplied at a later date |
| ☐ | Digestive Injury: N/A.<br>Date of onset: _____<br>Date physician first connected this injury to WTC work: _____ | ☑ | Other Injury: N/A.<br>Date of onset: _____<br>Date physician first connected this injury to WTC work: _____ |

## II.   FACTS SUPPORTING CONTENTION THAT LISTED DEFENDANTS NOT IMMUNE FROM LIABILITY

59.     The City of New York and its Contractors maintained primary control of the WTC Site from September 11, 2001 until June 30, 2002 in conjunction with the Port Authority of New York and New Jersey.

a)  After the tragedy of 9/11 occurred, the scope and complexity of the WTC disaster required On September 11, 2001, the City of New York to assumed management and coordination and control of work and debris removal operations at the WTC Site. The City's Department of Design and Construction ["DDC"] contracted with four construction managers ["CMs"], Bovis Lend Lease LMB, Turner Construction Company/Plaza Construction Corp., Tully Construction Co., Inc. and AMEC Construction Management, Inc., who then hired and their tiers of sub-contractors, to perform the debris removal and assist with recovery operations.[5] The WTC site was divided into four quadrants, or "zones." Each construction manager was in control of a "zone" of the WTC Site, Tully Construction Co., Inc. controlled Zone 1 in the eastern quadrant, Bovis Lend Lease LMB controlled Zone 2 in the southwest quadrant, AMEC Construction Management, Inc. controlled Zone 3 in the northwest quadrant and Turner Construction Company/Plaza Construction Corp. controlled Zone 4 in the northernmost quadrant which encompassed WTC 7.  The DDC, working with the Port Authority of New York and New Jersey, managed and controlled the demolition, excavation and debris removal at the WTC Complex.[6, 7] Undoubtedly the City of New York was in control of the work site.

b)  The City of New York, through its DDC and the four CMs, in conjunction with the PA, until on or about June 30, 2002 controlled the WTC Site absolutely.  After

---

[5] Undated Executive Summary of a Debris Removal Insurance program by James G. Smith of FEMA. Written in response to a 3/15/2002 correspondence from Ted Monette.  *See* FEMA-DC00004560.

[6] Memorandum from Kenneth Holden of the DDC to Mayor Michael Bloomberg dated 3/6/2002 discussing the DDC's WTC Debris Removal project.  *See* CITYCM3-00072305.

[7] "It will be the responsibility of the DDC to determine which Contractor should undertake work in each area."  *See* CITY CM3-00014395.

June 30, 2002, the City returned complete physical control of the site to the PA.[8]

During the period of time described above, the City and its contractors determined and controlled access to the WTC Site, deciding who would have access, how that access would take place and under what constraints.[9, 10] As evidence of this continued control, even personnel affiliated with Federal agencies required passes issued by the City to gain access to the site.[11]

c) As the United States government itself acknowledged, the City and its contractors initiated, undertook and completed the debris removal.[12] The City financed the work of the primary contractors. The four prime contractors or "CMs," as well as the subcontractors, were not volunteers. In fact, they were paid tens of millions of dollars by the City, through checks issued by the City's Comptroller's office, for the work they performed beginning September 11, 2001. For example, on September 20, 2001, the City forwarded a check in the amount of Ten Million

---

[8] *See* Declaration of Richard A. Williamson, Esq. in Connection With Section III(A)(2) and III(A)(3) of case management order No. 3 dated March 16, 2005, stating, *inter alia*, that the City of New York had control of the debris removal operations on the site immediately following the attack on 1 WTC at approximately 8:46 a.m. on September 11, 2001 and retained such control over the site until June 30, 2002 (except for 7 WTC, the control of which was returned to the Port Authority on May 10, 2002).

*See* Deposition Testimony of Jack Klein for Silverstein Properties, Inc., September 14, 2005, Tr. pp. 25-26; 28-30; 39-41.

[9] A Department of Health Memorandum dated October 7, 2001, entitled "Health and Safety Controls at WTC Disaster Site," said, "NYPD is responsible for site security (*i.e.* access at perimeter and movement with in red zone)." *See* CITYCM3-00041825.

[10] Visitors to the WTC site were to be properly escorted by New York City personnel at all times "so as not to place themselves in a position where they might be injured…" *See* CITYCM3-00041737.

[11] An undated facsimile message from the State Department to Ted Monette regarding international participation at the WTC project states that logistic support will be coordinated between the City of New York and the Department of State. Badging credentials are the requirement of the City of New York. The representatives would have no access to the disaster site, except by special invitation at the discretion of the City of New York. *See* FEMA-DC00001677

[12] "The work for debris removal will be accomplished by the City of New York and reimbursed through the Public Assistance Program." "The Local and State governments have not requested direct federal assistance for these activities and are effectively completing the activities described under the Mission Assignment." *See* FEMA-DC0013239.

Dollars ($10,000,000) to AMEC Construction.[13]  By January 25, 2002, payments to AMEC from the City totaled nearly sixty million dollars.[14]  On March 18, 2002, Bovis Lend Lease estimated that total construction dollars, all to be paid outright by the City, "will be of the order of 225 million."[15]

d)  Even when compliance levels with safety and health regulations in the debris removal operations were at their lowest, contractor oversight remained controlled by the DDC, the City going so far as to actually reduce contractor supervision.[16,] [17]

e)  The Health and Safety plan was managed and enforced by Liberty Mutual under a DDC Contract.[18]  The City, its contractors and the PA collected information necessary for the enforcement of health and safety laws, rules and regulations at the WTC Site.  The DDC and its contractors, most prominently, Bechtel Environmental Safety & Health ("Bechtel") and the PA, inspected the WTC Site to determine safety conditions and enforce compliance with personal protective

---

[13] *See* AMECM3-000000183: September 20, 2001 Correspondence from DDC to AMEC enclosing initial payment.

[14] *See* AMECM3-000000634

[15] *See* AMECM3-000000631

[16] "Presently, three prime contractors are operating at the GZ site proper.  Tully, Bovis and AMEC continue with debris removal and supporting operations.  Plans, according to DDC, are to shift to one prime contractor over the next two weeks.  This shift to one contractor will ease the contract oversight burden required by DDC.  DDC plans to cut its management oversight workforce by 75% by the end of December."  *See* Memorandum dated November 30, 2001 from Allen Rose of the Army Corps. Of Engineers to Sean Dowling at FEMA regarding a time and materials contract at Ground Zero. *See* FEMA-DC00004401.

[17] "Recommend that construction management be handled by one designated GZ prime contractor and DDC to continue to provide project management/oversight."  *See* Memorandum from Allen Rose, ACOE, to Sean Dowling at FEMA regarding time and materials contract at Ground Zero. *See* FEMA-DC00004404.

[18] *See* FEMA-NY00067895.

equipment ["PPE"] requirements, set forth by the City.  These reports are extensively detailed and were prepared throughout the recovery effort.[19]

f)  The City's contractors also accepted responsibility for the WTC Project Environmental Health and Safety  ["EH&S"] Plan enforcement.[20]  Each prime contractor and their subcontractors were responsible for implementation, enforcement and compliance with all aspects of this WTC EH&S Plan.[21]  The City's primary contractors were not drones, taking directions blindly from the DDC and other municipal agencies. To the contrary, the primary contractors exercised discretion and authority at the WTC Site and had full decision-making power.[22]  The primary contractors had the authority to hire sub-contractors and disburse City funds "based on project needs and reasonable accounting practices."[23]  Official documents provided to the primary contractors by the City

---

[19] *See* CITYCM3-00014844-57 and CITYCM3-00021319-21518.

[20] "Each prime contractor and their subcontractors are responsible for implementation, enforcement and compliance with all aspects of this plan." *See* CITYCM3-00041686.

An organizational chart included in the ES&H Plan depicts the DDC at the very top of a complex hierarchy of agencies and contractors charged with oversight.  *See* CITYCM3-00041687.

[21] *See* EH&S Plan at PA-CMO3-0000057.

[22] *See* Holden Depo. at pp. 197-198:

A.  Yeah, that's clearly Bovis.  Bovis is contractor in that last sentence.

Q.  Okay.  When the document indicates that the contractor is now authorized to disburse the funds utilizing its best judgment based upon the two criteria listed, what is your understanding as to what the project needs would be?

A.  Certainly, you know, putting it in the context of September 20th, so nine days after the tower collapsed, we were still working you, you know, in the heart of rescue operations.  So at that point in time Bovis was not only being directed by DDC, but also FDNY, PD, and PAPD  personnel to take -- to help direct equipment on the site to aid in what we thought were rescue issues at the time.

Q.  Was Bovis to use this money to pay subcontractors?

A.  To cover their own staffing costs and subcontractors, correct.

[23] *Id.*

throughout the rescue, recovery and debris removal operation, well into 2002, confirm this ability.[24]

g) Sub-contractors working at the WTC Site were hired and paid, by the primary contractors.[25]  In accordance with their role as "managers" of the WTC Site, each of the four primary contractors received a management fee for their work.[26]  If one of the primary contractors determined that an aspect of the subcontractors' work was inferior, the "coercion of withholding payment," could be used to effect improvement in the performance of the subcontractor.[27]  This "kind of regular interaction with contractors or subcontractors was pretty standard operating procedure."[28]  This control, exercised by the primary contractors, could have been used to ensure a subcontractor's compliance with environmental and occupational safety and health requirements.[29]  However, this control was never used for the benefit and safety of the WTC workers. Former Commissioner Kenneth Holden testified of his concern that primary contractors "would be exposed to numerous lawsuits based on hazardous materials at the site long after the project was done."[30]

---

[24] *See* AMEC CM3-000000634, DDC Correspondence to AMEC dated January 24, 2002, transmitting $10,000,000 to primary contractor AMEC to disburse City funds as it sees fit; *see also*, Defendants'. Holden Depo. at pp. 201-202.

[25] *See* Holden Depo. at pp. 206-207.

[26] *Id.,* at  pp. 235-236.

[27] *Id.,* at pp. 214-215.

[28] *Id.,* at p. 215.

[29] *Id.,* at pp. 215-216.

[30] *Id.,* at pp. 219-220.

h)   Contracts between the City and its four primary contractors were not signed.[31] These draft contracts, embodied the terms, conditions and requirements of the agreement between the City and the primary contractors for the work to be performed at the WTC Site. [32]   For this reason, the draft contracts set forth the duties and responsibilities of each of the four primary contractors at the WTC Site.[33]   On September 29, 2001 and October 11, 2001, the DDC circulated, to each of the four primary contractors, copies of then working drafts of the agreements.[34]

i)   Importantly, Mayor Giuliani, Governor Pataki and/or President Bush suspended no federal, state or local laws with respect to protection of workers. [35]  New York State Labor Law § 200, New York State Labor Law § 241 *et seq*., including §241(6), General Municipal Law § 205-a and General Municipal Law § 205-e, among other statutes and regulations, were neither suspended nor revoked on or after September 11, 2001.[36]   Because no federal, state or local laws were suspended or revoked with respect to protection of workers, the contracts with the CMs emphasized the primary contractors' obligations to comply with said laws:

---

[31] *Id.,* at pp. 222-223.

[32] Id., at pp. 223-224; "[E]ven though they were not signed, the contractors knew that they were a binding document, except for the remaining issue…the indemnification issue." *Id.,* at p. 238;  "Indemnification…was the only issue preventing everyone from signing contracts." *Id.,* at pp. 238-239.

[33] *Id.,* at p. 240.

[34] *See* CITYCM3-00030568 *et seq.* and CITYCM3-0001442 *et seq.*

[35] *See* W Murray Depo.at p. 183:

Q.  Do you have any knowledge as to whether or not any laws were suspended during your work, Turner's work at Ground Zero between September 12, 2001 and December 2001?

A.   I don't know of any laws specifically suspended.

[36] *Id.*

Sec. 2.2.  The Contractor <u>shall</u> comply with all local, State and Federal laws, rules, regulations and orders issued pursuant to any Emergency Declaration applicable to this Agreement and to the work to be done hereunder.[37]  (emphasis added)

Accordingly, defendants were required to comply with New York State Labor Law §200, § 241, including §241(6) and  NY State Municipal Law §205a-e at all times on and after September 11, 2001.[38]

j)  The contracts make clear that the four primary contractors bore responsibility to ensure the safety of <u>all of those lawfully present at the WTC Site</u>; such responsibility was not limited to the primary contractors' own employees:

> <u>Sec. 15.2</u> During the performance of the Work and up to the date of Final Acceptance, the Contractor shall take all reasonable precautions to protect the persons and property of the City and of others from damage, loss or injury resulting from the Contractor's and/or its Subcontractors' operations under this Contract. The Contractor's obligation to protect shall include the duty to provide, place or replace and adequately maintain at or about the Site suitable and sufficient protection…[39] (Emphasis added).

k)  In addition, the primary contractors were to ensure that subcontractors were complying with federal, state and local safety regulations.  Under Sec. 11.4.20, the primary contractors were to "***monitor compliance by the Subcontractors with the following requirements applicable to the Work: (1) New York State Labor Law… .***"[40]  (Emphasis added).

l)  All "emergency" conditions had ended by September 15, 2001.  By that time, it was clear to all involved that no additional living survivors would be thereafter

---

[37] *See* CITYCM3-00030575 (Emphasis in the original).

[38] *See* Contracts for Debris Removal - CITY CM3-00030589.

[39] *See* Plaintiffs' Ex. 184, CITY CM3-00014463.

[40] *See* Plaintiffs' Ex.185, CITY CM3-00030589.

found in the WTC Site.  As of September 29, 2001 the Mayor officially declared

that that there would not be additional survivors found at the WTC Site.[41]

60.     Defendants' conduct was not subject to the discretion and control of any federal

official or agency.

a)     The Occupational Safety And Health Administration (OSHA) did not enforce its

regulations at the World Trade Center Site, nor supervise nor control the work

done there. OSHA did not and could not enforce any of its standards on the WTC

worksite *by agreement with the City of New York and the contractors*, reportedly

at the City's direction.[42]   Although OSHA standards were applicable, it was the

Defendants, not OSHA, who were tasked with and accepted the responsibility for

site safety code enforcement. At her deposition, Patricia Clark, the New York

Regional Director for OSHA, was asked whether OSHA was designated a "co-

incident commander" at the WTC site and she answered "no."[43] When asked

what role, if any, OSHA played at the World Trade Center site, she testified that

"we provided technical assistance and support to the other federal agencies at the

---

[41] *See* Defendants' Ex. V, Burton Depo. p. 55:

    Q:  Did there come a time when it was clear that there were no survivors or further
        survivors after September 11, 2001?

    A:  The mayor at some point did establish a date, I think, that the rescue effort was over
        and the recover effort has started.  I can't recall the date at this point.

    Q:  Well does September 29, 2001 refresh your recollection as to the date?

    A:  That's about the date I think it happened.

[42] "Both OSHA and PESH, … *are present on the site on a consultative basis. They do not have the power*,
at this point, other than the power of persuasion, to enforce safety and health regulations and rules." *See* Public
Hearing on Air Quality and Other Environmental Public Health Matters Resulting from the 9/11/01 Tragedy:
November 26, 2001, at p. 326.
[43] Deposition of Patricia Clark, Nov. 18, 2005 ["Clark Dep."]at p. 17.

site as well as to the City and the state."[44] Ms. Clark testified that the City of New York, including its Department of Design and Construction ("DDC"), was the co-incident commander at the Trade Center. In that capacity, she testified, the DDC's role was "leading the recovery and removal of the debris as far as oversight and leadership function."[45] She denied flatly that OSHA ever directed the activities of the DDC.[74]

b)  The Federal Emergency Management Agency (FEMA) neither controlled nor supervised the work done at the World Trade Center Site. On September 14, 2001, President George W. Bush declared that a national state of emergency had existed since the September 11, 2001 attacks. The President's declaration served to activate the provisions of the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") (42 U.S.C. Sec. 5121, *et seq.*).[46] FEMA's primary role was to provide reimbursement to the New York City and New York State agencies for the work performed.[47,48] FEMA was not in control of and did not direct the work of the City or its contractors at the World Trade Center site.[49]

---

[44] *Id.*

[45] *Id.*

[46] One of the Stafford Act's purposes is to "spread the risk of the cost of major disasters from the citizens of the disaster-stricken community to the citizens of the entire country." State of Hawaii v. Federal Emergency Management Agency, 294 F.3d 1152, 1160 (9th Cir., 2002).

[47] As FEMA commented: "Debris removal operations are under the direction of the DDC. FEMA is responsible for administering the Federal Funds that will be granted to the State of New York and various applicants under this disaster. The City … is a sub-grantee." *See* CityCM3-00033810.

[48] FEMA's active role in the disaster, according to former DDC Deputy Commissioner Michael Burton, was to pay the contractors. "They -- one of the direct issues that they are involved with and were involved with down at the World Trade Center was to reimburse the City for money." *See* Burton Testimony, September 8, 2005, at p. 20. "Debris removal operations are under the direction of the … DDC. FEMA is responsible for administering the Federal Funds that will be granted to the State of New York and various applicants under this disaster. The City…is a sub-grantee"

[49] "The Public Assistance Program is voluntary. If all eligibility requirements are met and you wish to seek federal reimbursement, you must adhere to the program guidelines." FEMA-NY00042518: State Emergency Management Office Federal Emergency Management Agency Public Assistance Program - Applicant's Handbook.

FEMA provided hundreds of millions of dollars to the City for the recovery effort and FEMA itself acknowledged the City's leadership role in the recovery.[50]

c)   The Army Corp of Engineers ["ACOE"] neither controlled nor supervised the work done at the World Trade Center Site. Following 9/11, the U.S. Army Corps of Engineers ["ACOE"] only provided technical assistance at specific times when requested and directed by the City.[51] The United States Army Corp of Engineers did not activate any personnel under the mission assignments for debris removal at Ground Zero as of September 17, 2001.[52] The ACOE was not  involved with the stabilization of the slurry wall, which was addressed by Bovis and its subcontractors.[53] Similarly, ACOE was not responsible for and had no direct involvement in, the debris removal operation at the WTC Site.[54,55] As ACOE Area Engineer Leach testified, the City and its contractors were responsible for the removal of debris from the WTC Site.[56] As a result, the ACOE did not contract with any private concern for the removal of debris,[57] and never assumed

---

[50]   "[A]s the lead entity for the response effort, the City will determine the necessity and priority of debris removal from both private and public property." *See* AMECM3-000000660: October 16, 2001 FEMA Correspondence.

[51]   The U.S. Army Corps of Engineers (will) provide technical assistance to NYC on an as required basis as NYC requests this assistance." *See* CITY CMC-00033810 - Debris Monitoring Plan.

[52]   FEMA-DC00013239.

[53]   "The ACOE will provide technical assistance to NYC on an as required basis as NYC requests this assistance." *See* CityCM3-00033810.

[54]   *See* Testimony of ACOE's David Leach, Area Engineer for Metropolitan New York, at p. 62.

[55]   Id. at pp. 64-65. (Ex. 58).

[56]   Deposition Transcript of David Leach, US Army Corps of Engineers, dated September 16th 2005, pp. 25-26.Q: Do you know if anyone from the Corps had any responsibilities for cleanup activities, remediation, debris removal at the WTC Site.
A. The Corps of Engineers, they were not responsible but they were providing support services to the recovery operation at the World Trade site?

responsibility for the debris removal operations.[58] The City and its contractors were in charge of the planning and execution of debris removal.[59]

    d)   The Environmental Protection Agency ["EPA"] neither controlled nor supervised the work done at the World Trade Center Site. As was the case with OSHA and FEMA, the EPA's involvement at the WTC Site in the days and weeks after September 11, 2001, was minimal and only advisory.[60] The New York City Department of Health ["DOH"] independently performed air testing at the WTC site, but failed to disclose the true results of the testing to the workers and the public about the dangers present at the site.[61] A letter from the USEPA to NYCDOH establishes that the EPA had no control over operations at the WTC Site.[62] Thus, to the extent that the City, through the DDC and the DOH, consulted with federal agencies about environmental safety and health issues at the WTC site throughout the recovery effort, the input of the federal government was merely advisory.

### III.   LISTED DEFENDANTS AGAINST WHOM LIABILITY IS ALLEGED

    61.    The following are responses to Request Nos. 11, 12 and 13 of the November 21, 2007 CMO pursuant to CMO 10:

**QUESTION 11:  Which other Defendants are alleged to have caused Plaintiff injury, if any (giving name of each such Defendant)?**

---

[57] *Id.* at pp. 69-70.

[58] *Id.* at p. 85.

[59] *Id.*

[60] Applicable federal statutes and regulations "do not obligate (the) EPA to respond to a given emergency, thereby allowing for local agencies to lead a response… ." *See* WTCP/PA-CMO3-0000280: *EPA's Response to the WTC Center Collapse; Office of the EPA Inspector General.*

[61] *See* Deposition of Isaac Weisfuse, M.D, September 16, 2005, at pp. 69-70.

[62] "We do not have the authority to enforce the worker health and safety policies for non EPA/USCG employees." *See* CityCM3-00007585-CityCM3-00007586.

**ANSWER:**  The following Defendants are alleged to have caused Plaintiff injury:

The City Of New York;  Liberty Mutual Insurance Company - MA;

The following Defendants shared the responsibility causing the Plaintiff's injuries with Liberty Mutual Insurance Company - MA: AMEC Construction Management, Inc.; Bovis Lend Lease LMB, Inc.; Survivair; Turner Construction Company; and Weeks Marine, Inc.Larry Krepela reserves the right to amend this response as additional information becomes available, including but not limited to documents and information received from the Defendants in pre-trial discovery.

*QUESTION 12(a):  What relationship did the Plaintiff have with each such Defendant?*

**ANSWER:** The Plaintiff is related to each of the Defendant(s) by and through the contracts or agreements between the Defendants themselves and the contracts or agreements between Plaintiff's employer's and the various Defendants, which were both oral and written, as well as through the working relationships between the Defendants that developed at the site.  The relationships between these Defendants and Larry Krepela are documented in the hierarchy of work performed.  These relationships were not always documented in writing and evidence of such relationships will be borne out by the testimony adduced at the depositions of the parties.

Based upon documents and information provided from the Defendants, the Plaintiff had the following relationship with each of the following Defendants:

The Plaintiff's relationship with **The City Of New York** was that the City was the general contractor of all the contractors who had the overall responsibility for directing and controlling all the work performed on the site at the WTC and Fresh Kills.  The City had the overall responsibility for site safety and health.

Upon present information and belief, the relationship detailed above involved or may have involved Larry Krepela's safety and health, the supervision and control of Larry Krepela, the manner in which Larry Krepela duties were carried out, the time and place Larry Krepela's duties were carried out, the conditions under which those duties were performed, the ability to impose sanctions for infractions and/or terminate Larry Krepela's employment, the ability to demand the stoppage of such work due to health, safety and health and other concerns was the responsibility of the The City of New York.  The City of New York's responsibilities included supervising, managing and controlling Larry Krepela's work; the above named Defendants' responsibilities included inspecting, directing, monitoring and testing the worksite for hazardous conditions; the above named Defendants were to be responsible for establishing workplace standards, enforcing workplace safety and health standards, provide and communicate safety and health instructions and warnings, were responsible for providing safety and health equipment for the work at issue and were responsible for communicating hazardous conditions to the workers, including Larry Krepela but the above named Defendants failed to do so, at all relevant times.

Larry Krepela reserves the right to amend this response, as additional information becomes available, including but not limited to documents and information received from the Defendants in pre-trial discovery.

***QUESTION 12(b):  What facts show the existence of the alleged relationship between Plaintiff and Defendant?***
***ANSWER:***  Generally, the facts that show the existence of the alleged relationship between the Plaintiff Larry Krepela are in the possession of the Defendants.  To the extent that information has been made available to Plaintiff, Larry Krepela it is cited in 12(b), herein.

Furthermore, upon information and belief, there are approximately 90 million pages of documents in the Defendants' possession which have not been disclosed to the Plaintiff Larry Krepela which contains relevant information as to the relationships between each Defendant. Those documents include but are not limited to, contracts between Defendants, indemnification agreements, work orders, minutes of meetings, insurance contracts, among other documents, as well as depositions which have not been conducted of the Defendants which would further allow Larry Krepela to document the relationships between the Defendants.  Because of his position, Larry Krepela is not aware of the specific contract provisions or legal rights between Defendants. Larry Krepela reserves the right to supplement this answer based upon continuing investigation and receipt of discovery from the Defendants.

The following documents and facts demonstrate the alleged relationship between the Plaintiff and **The City Of New York:**  BATES PA-CMO3-0000047-453, EH&S Plans.

Larry Krepela reserves the right to amend this response, as additional information becomes available, including but not limited to documents and information received from the Defendants in pre-trial discovery.

**QUESTION 13:        What acts or omissions of each Defendant caused the injuries of which Plaintiff complains?**

**ANSWER:**

The City of New York is responsible for the following acts and omissions with regard to Air monitoring:  Failed to perform  the required atmospheric monitoring in and around the WTC site. The City of New York is responsible for the following acts and omissions with regard to Break/Decontamination Zone:  Failed to provide access to and/or failed to require visits to legally mandated decontamination facilities.  Failed to provide workers with a safe, uncontaminated place to take meals or breaks. The City of New York is responsible for the following acts and omissions with regard to Enforcement:  Failed to comply with the provisions in the WTC EH & S Plan for respiratory protection of workers.  Failed to comply with the WTC EH & S Plan and applicable laws, rules, regulations and standards.  Failed to employ adequate, properly trained and/or sufficient personnel for the purposes of supervising, inspecting, testing, enforcing, maintaining site safety and health and safe working conditions.  Failed to employ as safety and health officers reasonable and prudent persons experienced in construction,

demolition or excavation work.  Failed to enact, implement and/or enforce an adequate policy for respirator use.  Failed to have a competent safety and health officer at the site.  Failed to have a safety and health officer present at the site for days.  Failed to supervise and enforce safety and health practices with regard to the injury-producing work.  Violated OSHA standards by failing to verify that a workplace hazard assessment had been performed through a written certification identifying: a. the location of the workplace evaluated and b. the person certifying that the evaluation had been performed. The City of New York is responsible for the following acts and omissions with regard to General Safety and Health:  Failed in its absolute and non-delegable duty to comply with all applicable safety and health standards, codes, statutes, ordinances and regulations.  Failed in its absolute and non-delegable duty to provide a safe work environment. Failed to provide PLAINTIFF with a safe and healthy work place, the required personal protective equipment, including respiratory protection, chemical impervious clothing, decontamination facilities, hazardous materials training, respiratory fit testing and instruction. The City of New York is responsible for for the following acts and omissions with regard to Medical Screening / Monitoring:  Failed to adopt and implement the required medical surveillance program for workers exposed to hazardous substances.  Failed to establish an adequate surveillance system to monitor workers" health conditions.  Failed to provide medical screening to workers. The City of New York is responsible for the following acts and omissions with regard to PPE:  Allowed the workers to enter the site without sufficient personal protective equipment.  Failed in its absolute and non-delegable duty to provide workers, including the Plaintiff, with proper and adequate PPE.  Failed to comply with applicable OSHA standards by allowing defective or damaged personal protective equipment to be used.  Failed to implement, enforce and advise the consultants and contractors with the WTC EH & S Plan.  Failed to prevent the use of the defective or damaged personal protective equipment.  Failed to provide protective clothing.  Failed to provide workers with and/or failed to require workers to use the legally mandated eye protection. The City of New York is responsible for the following acts and omissions with regard to Respirators:  Failed to provide appropriate replacement cartridges for respirators.  Failed to provide properly fit tested respiratory protective equipment suitable for use at the World Trade Center Site.  Failed to provide workers with and/or failed to require worker to use  air system or self-contained breathing apparatus (SCBA) when there were high readings of volatile organic compounds (VOC). The City of New York is responsible for the following acts and omissions with regard to Training:  Failed in its absolute and non-delegable duty to train workers, such as the Plaintiff in the proper use of PPE.  Failed to provide workers with and/or failed to require workers to attend WTC site-specific safety and health training before or while performing work at WTC.  Failed to require workers to attend the OSHA 10-hour Safety and Health Course or any safety and health training.  Failed to train and supervise employees responsible for inspection, supervision, testing, enforcing, maintaining site safety and health and safe working conditions.  Violated, among other laws, New York State Labor Law and OSHA standards by failing to provide adequate training for employees, uniformed services, and workers required to use PPE.  Violated, among other laws, New York State Labor Law and OSHA standards by failing to train and inform workers (i) when PPE is necessary; (ii) what PPE is necessary; (iii) how to properly don, doff, adjust and wear PPE; (iv) the limitations of the PPE; and (v) the proper care, maintenance, useful life and disposal of the PPE. The City of New York is responsible for the following acts and omissions with regard to Unsafe work area:  Failed in its absolute and non-delegable duty to take reasonable steps to abate dangerous conditions.  Failed to contain dust during loading and unloading of debris to and from the trucks.  Failed to inspect

and/or adequately inspect work area for hazardous conditions.  Failed to maintain areas in which construction, excavation or demolition work was being performed in a reasonably safe condition.  Failed to prevent cross-contamination between the zones as trucks with debris and equipment were allowed to move from zone to zone.  Failed to provide adequate dust suppression.  Failed to use reasonable care in constructing, shoring, equipping, or guarding the site or in arranging, operating or conducting the work in that area.  Failed to verify that workplace hazard assessment had been performed through a written certification identifying: a) the location of the workplace evaluated; b) the person certifying that the evaluation had been performed; and c) the date(s) of the hazard.  Violated, among other laws, New York State Labor Law and OSHA standards by failing to provide for the reasonable and adequate protection of the lives, health and safety and health of all persons they employed at the World Trade Center site or of those persons lawfully frequenting the site. The City of New York is responsible for the following acts and omissions with regard to Warning:  Failed in its absolute and non-delegable duty to warn workers of worksite dangers.  Failed to advise workers that the dust conditions were dangerous and required the use of PPE at all times.  Failed to communicate to workers at the site or to their treating physicians, the information as to the hazardous conditions present at the site and the dust exposures.  Failed to place warning signs, notice lights, barriers, ropes and/or cones around the areas with high levels of exposure to air contaminants.  Failed to provide truthful or accurate information about the hazards of work at Ground Zero to the public or workers, including the Plaintiff.  Failed to warn workers of the dangers posed by the exposure to dust re-released into the atmosphere during the activities at the site.  Made false statements that the air at the World Trade Center site was safe.  Misrepresented in bad faith that dermal protection, including but not limited to, Tyvek suits were unnecessary.  Misrepresented to the Plaintiffs that the air was "good," that the air was "safe to breathe," and that they did not need to wear respirators. The acts or ommissions outlined below with regard to Liberty Mutual Insurance Company - MA are also alleged against the following Defendants: AMEC Construction Management, Inc.; Bovis Lend Lease LMB, Inc.; Survivair; Turner Construction Company; and Weeks Marine, Inc.

In addition, upon information and belief, there are roughly 90 million pages of documents in the Defendant's possession that have not been disclosed to the Plaintiff Larry Krepela which contains relevant information as to dates and times each of the acts and omissions occurred by each Defendant.  Those documents include but are not limited to, work orders, invoices for respirators or lack thereof, minutes of meetings, among other documents, as well as depositions which have not been conducted of the Defendant which would further allow Larry Krepela to document the acts and omissions the Defendant.  Larry Krepela reserves the right to supplement this answer based upon continuing investigation and receipt of discovery from the Defendant.

Larry Krepela reserves the right to amend this response, as additional information becomes available, including but not limited to documents and information received from the Defendants in pre-trial discovery.

      **a.**       **On what dates and times did the acts or omissions occur?**

**ANSWER:**  The exact dates each Defendant worked and was present upon this site is information more particularly asked of each Defendant.  To the extent the Plaintiff and his counsel is aware, upon information and belief, the acts and omissions of Defendant occurred after September 11, 2001 and more particularly as follows:

 In addition, upon information and belief, there are roughly 90 million pages of documents in the Defendants' possession that have not been disclosed to the Plaintiff Larry Krepela which contains relevant information as to dates and times each of the acts and omissions occurred by each Defendant.  Those documents include but are not limited to, work orders, invoices for respirators or lack thereof, minutes of meetings, among other documents, as well as depositions which have not been conducted of the Defendant which would further allow Larry Krepela to document the acts and omissions of each of the Defendants.  Larry Krepela reserves the right to supplement this answer based upon continuing investigation and receipt of discovery from the Defendant.

Larry Krepela reserves the right to amend this response, as additional information becomes available, including but not limited to documents and information received from the Defendants in pre-trial discovery.

> a.     **Describe the chain of events, in as much detail as possible, describing how the acts and omissions of each Defendant caused the injuries of which Plaintiff complains.**

**ANSWER:**    Since the chain of events for each defendant is unique to that defendant, those plaintiffs who have a relationship with a given defendant will necessarily detail the same chain of events. Those events are detailed in the Master "Chain of Events," that was served on May 7, 2007 and which this responding Plaintiff adopts here by reference.  To the extent that there is additional information particular to Plaintiff, it is detailed herein.

**Identify all personal protective equipment ("PPE") each Plaintiff utilized.**

 **ANSWER:** None.

> **When did Plaintiff use the PPE identified in 13(c)?**

**ANSWER:**  Not applicable.

> **Was there guidance or instructions for use and, if so;**

**ANSWER:**  None.

> **By whom and when; and**

**ANSWER:**  None.

**What specific complaints does each Plaintiff allege against each Defendant regarding the PPE they used or did not use:**

**ANSWER:** Defendants did not provide Plaintiff with the proper PPE, including but not limited to, respiratory protection, in violation of all applicable laws, standards, codes, rules, regulations and policies, *see* Answer to 13 (b) *supra*.

### ii.   CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION

62.     Plaintiffs (Plaintiff) repeat(s), reiterate(s) and reallege(s) each and every other paragraph contained in this Complaint with the same force and effect as if set forth more fully at length herein and further allege the following.

63.     It was plaintiff's duty to respond to the emergency at the site as outlined in paragraph 14, *supra*.

64.     On or about September 11, 2001 and continually thereafter, the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s) were aware of the danger of exposure to toxic substances, both known and unknown, in the air and Dust at the World Trade Center Site and/or other buildings or locations or portions thereof.

65.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to provide for the safety, protection and well-being of persons lawfully working at the World Trade Center Site and/or other buildings or locations or portions thereof and performing the Work.

66.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to provide a reasonably safe place to work for persons lawfully performing the Work at the World Trade Center Site and/or other buildings or portions thereof.

67.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to provide for the safety, protection, health and well-being of persons lawfully working at the World Trade Center Site and/or other buildings or locations or portions thereof and performing the Work, including, but not limited to a duty to monitor air quality at the World Trade Center Site and/or other buildings or locations or portions thereof, before, during and after the commencement of said Work.

68.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to provide a reasonably safe place to work for persons lawfully performing the Work at the World Trade Center Site and/or other buildings or locations as identified in the Check-Off Complaint or a portion thereof.

69.     At all relevant times, it was the duty of Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), to provide, furnish and/or ensure the use of safe, suitable and an adequate work environment, adequate protective equipment, including, but not limited to: protective clothing, masks, respirators, cleaning supplies and decontamination equipment, as well as safe work equipment, safety devices and/or apparatus for all persons lawfully participating in the rescue and recovery effort at the Work at the World Trade Center Site and/or other buildings or locations or portions thereof.

70.     Beginning on or about September 11, 2001 and continuing for days, weeks and/or months thereafter, the Plaintiff was lawfully present at the World Trade Center Site and/or other buildings or locations or a portion thereof.

71.     Beginning on or about September 11, 2001 and continuing for days, weeks and/or months thereafter, the Plaintiff(s) participated in the rescue and recovery and/or debris removal

efforts at the World Trade Center Site and/or other buildings or locations or a portion thereof, in the course and discharge of his (her) (their) employment duties.

72.     Beginning on or about September 11, 2001 and continuing for days, weeks and/or months thereafter, the Plaintiff(s) was (were) exposed to toxins, contaminants and other harmful airborne products at the World Trade Center Site and/or other buildings or locations or portions thereof, during his (her) participation in the Work at the World Trade Center Site and/or other buildings or portions thereof.

73.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), operated the site in a negligent and careless manner.

74.     At all relevant times, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), utilized apparatus provided in connection with the rescue and recovery effort in a negligent and careless manner.

75.     On and after September 11, 2001, there existed a dangerous, defective, hazardous, unguarded, unsupervised, unprotected and unsafe toxic condition at the said work site at the World Trade Center Site and/or other buildings or locations or portions thereof.

76.     In consequence of the aforedescribed exposure to toxins, contaminants, Dust and other harmful airborne products at the World Trade Center Site and/or other buildings or locations or portions thereof, the Plaintiff sustained physical and other injuries.

77.     At all relevant times, in violation of applicable city, state and federal statutes, law, rules and regulations, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permittee(s) and/or contractor(s), failed to provide for the safety, protection, health and well-being of persons lawfully performing the Work at the World Trade Center Site and/or other buildings or locations or portions thereof, including the Plaintiff(s).

78.     At all relevant times, in violation of applicable city, state and federal statutes,

laws, rules and regulations, Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s),

permitee(s) and/or contractor(s), breached the aforementioned duties and non-delegable duties

and failed to comply therewith by inter alia, failing to properly notify Plaintiff(s) of the

dangerous levels of toxins, contaminants, teratogens and other harmful elements in the air, dust

and on the surfaces at the World Trade Center Site and/or other buildings or locations or portions

thereof; failing to establish and implement a proper and/or effective respiratory protection

program and/or eye protection program; failing to provide Plaintiff(s) with appropriate

respiratory protection, eye protection, protective clothing and/or all equipment necessary to

protect his (her) (their) health; failing to protect Plaintiff(s) from exposure(s) and or

contamination by known and unknown contaminants; failing to prevent and/or minimize

atmospheric contamination; failing to use effective engineering controls; failing to provide

appropriate surveillance and/or inspection of the conditions at the World Trade Center Site

and/or other buildings or locations or portions thereof, the work site and/or the Work and/or to

monitor the degree of Plaintiff(s) exposure, which Defendant(s) its (their) servant(s), agent(s),

employee(s), lessee(s), permitee(s) and/or contractor(s), knew or should have known would

detrimentally affect the safety and/or health of Plaintiff(s) and allowing such dangers to continue

unabated and without protection to Plaintiff(s) from the same; creating unreasonable dangers to

Plaintiff(s); and failing to reflect and/or apply any subsequent updates, as necessary.

79.     The Plaintiff(s) was (were), at all relevant times, exposed to toxins, Dust,

contaminants and other harmful airborne products.  As a result of said exposure, the Plaintiff(s)

was (were) injured and by reason of the foregoing and by reason of the Defendant(s) having

violated the applicable statutes, ordinances, rules, orders and requirements, including, but not

limited to one or more of the following: the Occupational Safety & Health Standards as promulgated by the Occupational Safety and Health Administration, including, but not limited to: Article 1926, 29 U.S.C. Sections 654 et. seq.; the provisions of 29 C.F.R. §1910.38, §1910.132-134, §1910.146, §1910.120; §1910.156; §1910.1001, §1910.1025, §1910.1027, §1910.1000 and §1910.1200; the provisions of the U.S. Department of Welfare; New York State Labor Law, including, but not limited to: §200, §240 and §241(6); Article 2, §27-a, Article 28, §878; 12 NYCRR §820.4 and §23-1.8; The Industrial Code, including, but not limited to: §23-1.5, §23-1.7, §23-1.8, §23-1.9, §23-1.25, §23-1.26, §23-2.1; New York State General Municipal Law §205-a and/or §205-e; and other applicable rules, regulations and statutes.

80.     By reason of the foregoing, the Plaintiff(s) was (were), at all relevant times, exposed to toxins, Dust, contaminants and other harmful airborne products at the World Trade Center Site and/or other buildings or locations or portions thereof, such as fiberglass, glass, silica, asbestos, lead, benzene, organic matter and other hazardous chemicals, substances and elements.

81.     As a consequence of said exposures, the Plaintiff was seriously injured.

82.     At all relevant times, Defendant(s) its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or contractor(s) had actual and/or constructive notice of the dangerous and/or defective condition(s) at the World Trade Center Site and/or other buildings or locations or portions thereof.

83.     Said exposures and the resulting injuries and injuries to the Plaintiff(s) occurred as a direct and proximate result of and solely and wholly by reason of the carelessness, negligence, gross negligence, wanton and/or willful disregard and/or acts on the part of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or

contractor(s), without any fault, want, care, culpable conduct and/or negligence on the part of the Plaintiff, or Derivative Plaintiff, if any, contributing thereto.

84.    The Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or contractor(s), individually and/or jointly, had actual or constructive notice of the dangerous and defective conditions existing at the World Trade Center Site and/or other buildings or locations or portions thereof.

85.    This action falls within one or more of the exceptions set forth in CPLR §1602. The limitations on liability set forth in CPLR §1601 do not apply by reason of the exemptions set forth in CPLR §1602(2) and (7).

86.    Pursuant to CPLR §1602(2)(iv), Defendant(s) is (are) jointly and severally liable for all of Plaintiff's (Plaintiffs') damages, including, but not limited to Plaintiff's (Plaintiffs') non-economic loss, irrespective of the provisions of the CPLR §1601, by reason of the fact that Defendant(s) owed the Plaintiff a non-delegable duty of care.

87.    Pursuant to CPLR §1602(7), Defendant(s) is (are) jointly and severally liable for all of Plaintiff's (Plaintiffs') damages, including, but not limited to Plaintiff's (Plaintiffs') non-economic loss, irrespective of the provisions of the CPLR §1601, by reason of the fact that Defendant(s) acted with reckless disregard for the safety of others.

88.    Pursuant to CPLR §1602(2)(iv), the Defendant(s) is (are) jointly and severally liable for all of Plaintiff's (Plaintiffs') damages, including, but not limited to Plaintiff's (Plaintiffs') non-economic loss, irrespective of the provisions of the CPLR §1601, by reason of the fact that Defendant(s) is (are) vicariously liable for the negligent acts and omissions of each other and/or others who caused or contributed to the Plaintiff's (Plaintiffs') damages.

89.     Pursuant to CPLR §1602(11), the Defendant(s) is (are) jointly and severally liable for all of Plaintiff's (Plaintiffs') damages, including, but not limited to Plaintiff's (Plaintiffs') non-economic loss, irrespective of the provisions of the CPLR §1601, by reason of the fact that Defendant(s) acted knowingly or intentionally and in concert, to cause the acts or failures which are a proximate cause of Plaintiff's (Plaintiffs') injuries.

90.     Pursuant to CPLR §1602(8), Defendant(s) is (are) jointly and severally liable for all of Plaintiff's (Plaintiffs') damages, including, but not limited to Plaintiff's (Plaintiffs') non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that Defendant(s) should here be held liable pursuant to Article 10 of the Labor Law.

91.     By reason of the foregoing, the Plaintiff(s) sustained severe and permanent personal injury and/or disability and were rendered sick, sore, lame and has/have been maimed and/or disabled and will be permanently caused to suffer pain, suffering, inconvenience and other effects of such injuries.  In addition, the Plaintiff(s) incurred and in the future will necessarily incur further, doctor, hospital, physical therapy and/or medical expenses in an effort to be cured of said injuries; has been unable to continue, engage in and or attend to his/her usual vocation(s) and/or activities and has suffered and will necessarily suffer additional, loss of time and earnings from employment.

92.     By reason of the foregoing, the Plaintiff(s) seeks (seek) compensatory and exemplary damages in a sum to be determined by a jury.

## A.  AS AND FOR A SECOND  CAUSE OF ACTION:  PURSUANT TO GENERAL MUNICIPAL LAW SECTION 205-A

93.      Plaintiffs (Plaintiff) repeat(s), reiterate(s) and reallege(s) each and every other paragraph contained in this Complaint with the same force and effect as if set forth more fully at length herein and further allege the following.

94.      At all times hereinafter mentioned, New York's General Municipal Law Section 205-a (amended on October 9, 1996), provided, among other things, as follows:

### SECTION 205-a.  ADDITIONAL RIGHT OF ACTION TO CERTAIN INJURED OR REPRESENTATIVES OF CERTAIN DECEASED FIREMEN.

1.    In addition to any other right of action or recovery under any other provision of law, in the event any accident, causing injury, death or a disease which results in death, occurs directly or indirectly as a result of any neglect, omission, willful or culpable negligence of any person or persons in failing to comply with the requirements of any of the statutes, ordinances, rules, orders and requirements of the federal, state, county, village, town or city governments or of any and all their departments, divisions and bureaus, the person or persons guilty of said neglect, omission, willful or culpable negligence at the time of such injury or death shall be liable to pay any officer, member, agent or employee of any fire department injured, or whose life may be lost while in the discharge or performance at any time or place of any duty imposed by the fire commissioner, fire chief or other superior officer of the fire department, or to pay to the wife and children, or to pay to the parents, or to pay to the brothers and sisters, being the surviving heirs-at-law of any deceased person thus having lost his life, a sum of money, in case of injury to person, not less than ten thousand dollars and in such case of death not less than forty thousand dollars, such liability to be determined and such sums recovered in an action to be instituted by any person injured or the family or relatives of any person killed as aforesaid.

3.  This action shall be deemed to provide a right of action regardless of whether the injury or death is caused by the violation of a provision which codifies a common-law duty and regardless of whether the injury

or death is caused by the violation of a provision prohibiting activities or conditions which increase the dangers already inherent in the work of any officer, member, agent or employee of any fire department.

95.     The aforementioned exposures and resulting injuries to the Plaintiff(s) herein were caused by reason of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or contractor(s), having violated the applicable statutes, ordinances, rules, orders and requirements, including, but not limited to; Article 1926, 29 U.S.C. Sections 654 et. seq.; the provisions of 29 C.F.R. §1910.38, §1910.132-134, §1910.146, §1910.120; §1910.156; §1910.1001, §1910.1025, §1910.1027, §1910.1000 and §1910.1200; the provisions of the U.S. Department of Welfare; New York State Labor Law, including, but not limited to: §200, §240 and §241(6); Article 2, §27-a, Article 28, §878; 12 NYCRR §820.4 and §23-1.8; The Industrial Code, including, but not limited to: §23-1.5, §23-1.7, §23-1.8, §23-1.9, §23-1.25, §23-1.26, §23-2.1 .

96.     By reason of the foregoing, the Plaintiff(s) seeks (seek) compensatory and exemplary damages in a sum to be determined by a jury.

### B.  As and For a Fourth Cause of Action: Based Upon Common Law Negligence

97.      Plaintiffs (Plaintiff) repeat(s), reiterate(s) and reallege(s) each and every other paragraph contained in this Complaint with the same force and effect as if set forth more fully at length herein and further allege the following.

98.     The aforesaid exposure and the resulting injuries sustained by the Plaintiff(s) were caused by the negligence, gross negligence and recklessness of the Defendant(s) herein, its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or contractor(s), without the Plaintiff(s) contributing in negligence thereto.

99.     By reason of the foregoing, the Plaintiff(s) seeks (seek) compensatory and exemplary damages in a sum to be determined by a jury.

### C.  As and For a Fifth Cause of Action: for Fear of Cancer

100.    Plaintiffs (Plaintiff) repeat(s), reiterate(s) and reallege(s) each and every other paragraph contained in this Complaint with the same force and effect as if set forth more fully at length herein and further allege the following.

101.    As a direct and proximate result of Defendant(s) acts, omissions and conduct as set forth above, Plaintiff(s) has (have) been exposed to Dust, toxic fumes and hazardous substances and, as a result, has (have) an increased risk of invisible genetic damages and a reasonable fear of developing cancer at some future date as a result of his (her) (their) unprotected exposures at the World Trade Center Site and/or other buildings or locations or portions thereof.

102.    With reasonable probability, the prospective, feared and anticipated consequences may be expected to flow from the past harm.

103.    Plaintiff(s) will incur future expenses for medical monitoring and, as a result, seeks (seek) payment of his (her) (their) related medical expenses as an element of the consequential damages.

104.    The degree of probability that the Plaintiff(s) will develop cancer(s) is such that there is a reasonable certainty that such cancer(s) will develop at some future date, thus entitling Plaintiff(s) to recover here of these Defendants for apprehended consequences that are not presently manifested.

105.    A rational basis exists between Plaintiff's (Plaintiffs') exposure(s) to the aforesaid Dust, toxins and contaminants and Plaintiff(s) currently manifested fear of developing cancer in the future.

106.    As a result of the foregoing, Plaintiff(s) seeks (seek) compensatory and exemplary damages in sum to be determined by a jury.

### D.  AS AND FOR A SIXTH  CAUSE OF ACTION: FOR FRAUD AND MISREPRESENTATION

107.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth at length herein and further alleges:

108.    That Defendants knew or should have known that the air quality in and around the WTC/Ground Zero area and/or other buildings or locations or portions thereof, was significantly polluted with hazardous particulates, aerosols, fumes, fibers, dust and materials all or some of which was dangerous for inhalation, contact, absorption or ingestion by humans.

109.    That the Defendants issued assurances or failed to investigate the veracity of assurances by others that pollution and toxic exposures were not a health threat, either to rescue workers or the general public, within days of the attack.  Notwithstanding these early assurances and other assurances in the days thereafter, Defendants knew or should have known that the conditions at the WTC/Ground Zero and/or other buildings or locations or portions thereof, were extremely hazardous and so had an obligation to truthfully make that information available to the Plaintiff.

110.    Tests conducted by the United States Geological Survey ("USGS") only a week after the September 11, 2001 attack demonstrated that the dust generated by Ground Zero was

highly caustic and thus capable of burning moist tissue in the throat, eyes and nasal passages.
This dust was determined to have a pH value of 9.0 to 11.0, which is highly alkaline and
comparable to ammonia. Some of the dust samples taken by the USGS on September 17-18,
2001 registered higher than 11.0 on the pH scale -- as caustic as liquid drain cleaners.[63]

111.    Similar tests were conducted by the New York Department of Environmental
Protection (NYDEP).

112.    Testing and monitoring methods on and around the WTC site were incorrectly
analyzed and evaluated by the use of averaging the test levels obtained from various locations in
and around the "pile." Hazardous waste sites are properly evaluated with respect to human
exposure potential at "hot spots," not the average of samples or samples from the perimeter or
off-site locations. The analytical data, when properly evaluated, reveals that there were
sufficiently high levels of total volatile organic compounds and benzene as to be far beyond the
limits of a cartridge respirator and to require, instead, self-contained breathing apparatus
(SCBA). On site benzene levels alone were sufficient to require the use of OSHA level A or B
protective equipment including self-contained breathing apparatus and respirator fit tests.
Workers should have been fully encapsulated without dermal exposures to PAH and dioxin-
containing dust, both of which are absorbed through the skin.

113.    By utilizing a method of testing that averaged sampling taken from three on-site
points with approximately fifteen (15) perimeter or off-site locations with the samples acquired
inside the perimeter of the WTC site and at hazardous or pyrolitic plumes on the "pile," the
defendants artificially diluted the results of the testing, concluding that there were no significant

---

[63] Roger Clark, *et al.,* "Environmental Studies of the World Trade Center Area After the September 11, 2001 Attack" (USGS Open File Report OFR-01-0429)(http://pubs.usgs.gov/of/2001/ofr-01-0429/>), p. 4;  Phillip Landrigan, M.D., *et al*., "Health and Environmental Consequences of the World Trade Center Disaster," *Envtl Health Perspectives* 112(6):731-39, 732 (May 2004), at p. 16.

exposures and thus misleading the plaintiff(s) as to the nature and extent of the dangers to which they were exposed.

114.    Another flawed interpretation of the monitoring data applied by the USEPA was to diminish the significance of the on-site North Tower Center monitor, the South Tower monitor and the Building 5-SW monitor as they were largely "grab samples," rather than "full-day" samples.  These "grab samples" demonstrated the true nature of the workers' exposures and were more than sufficient to assess on site exposures without the need of "full-day" samples.  Indeed, as a practical limitation, 8-hour collections at the levels encountered would not have been possible due to overload (saturation) of the sample media.  The heavy load of particulate matter would have interfered with the sample collection process over an 8-hour run time.

115.    In addition to SCBA, proper OSHA-compliant fit testing and total body encapsulation, appropriate site-specific health and safety briefings should have been conducted at the earliest possible time to educate workers with respect to the chemical carcinogens present and the means to eliminate and/or minimize further exposures including, but not limited to: full decontamination procedures, elimination of hand-mouth activity, eating or drinking prior to decontamination and the hazards associated with the use of saturated respirator cartridges in benzene environments at levels of 180,000 ppb.  OSHA methods dictate that slip-on respirator masks are only designed to provide a 10-fold reduction in exposure.

116.    Respirator fit testing done at and around the WTC site was illusory, at best.  The fit testing performed at and around the site for WTC site workers did not meet OSHA standards.

117.    By providing insufficient and inappropriate environmental testing, equipment and fit testing, defendants, their agents, employees, servants and subcontractors led the plaintiff(s) to

believe that the environment they worked in and the protective equipment -- if any-- they utilized for such work, was sufficient to protect them from hazardous exposures during the work.

118.    Despite this testing, NYDEP, defendant City of New York and other defendants failed to make this information available to the workers at the WTC/Ground Zero sites and/or other buildings or locations or portions thereof, including Plaintiff.  Indeed, NYDEP and the Defendants affirmatively mislead workers at the WTC/Ground Zero sites and/or other buildings or locations or portions thereof, including Plaintiff, by advising that the air and premises in and around the sites was safe.

119.    Although Defendants knew or should have known, obtained or should have obtained the information regarding the true nature of the dangers from the air and other contamination in and around the WTC/Ground Zero sites and/or other buildings or locations or portions thereof, the information was not transmitted to treating physicians or the workers at Ground Zero and/or other buildings or locations or portions thereof and those workers were deprived of the opportunity to seek out protective clothing, respiratory or eye protection, or other hazardous materials protections or to take steps to end or limit their exposures at the site.

120.    The Defendants fraudulently, intentionally and negligently misrepresented the conditions present at the World Trade Center/Ground Zero site(s) and/or other buildings or locations or portions thereof and further fraudulently, intentionally and negligently misrepresented the Plaintiff's need for protective equipment, masks, respirators, eye protection, protective clothing and other necessary precautions and equipment while working at the site(s). In so doing, the Defendants negligently, recklessly and knowingly concealed material adverse information regarding the hazardous conditions and the unreasonably hazardous nature of the work and the job site where Plaintiff was assigned to work, to Plaintiff's extreme detriment.

121.     The Defendants made these misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that the job site had multiple defects, dangers and characteristics that were unreasonably hazardous for human exposure without sufficient safety equipment, clothing, masks and respirators and other precautions.

122.     That the Defendants made or permitted these misrepresentations to be made on their behalf to the Plaintiff and the public and other public entities, including the New York City Fire Department, the New York City Police Department, the Utilities and the Union Memberships representing the Plaintiffs herein at the job site(s).   Specifically, the defendants misrepresented to and/or actively concealed from Plaintiff(s), public entities and the public living and working in the surrounding areas that:

   a.   it was dangerous to allow plaintiff and the public on the aforementioned premises.

   b.   the aforementioned premises carried the risk of serious adverse effects, injuries and illnesses resulting from exposures therein;

   c.   there had been insufficient and inconclusive studies regarding the safety of Ground Zero and/or other buildings or locations as identified in the Check-Off Complaint or a portion thereof;

   d.   while knowing that there had been insufficient or inadequate testing of the premises at Ground Zero and/or other buildings or locations as identified in the Check-Off Complaint or a portion thereof, Defendants negligently, recklessly, knowingly and intentionally permitted and encouraged Plaintiff and other similarly situated persons to continue working at the World Trade Center/Ground Zero site and/or other buildings or locations as identified in the Check-Off Complaint or a portion thereof, without sufficient protective equipment, respiratory protection, protective clothing and other safety precautions.

123.     The above-described misrepresentations of and/or active concealment by the Defendants was perpetrated directly and/or indirectly by the Defendants, their representatives, employees, agents and/or co-defendants.

124.     The Defendants made these misrepresentations and/or actively concealed this information with the intention and specific desire that the Plaintiffs would rely on such and

would continue to provide their services at the World Trade Center/Ground Zero job site and/or other buildings or locations or portions thereof, notwithstanding the unreasonably hazardous working conditions present at those places during the relevant times.

125.    Plaintiff relied on and was induced by, the Defendants' misrepresentations and/or active concealment in deciding whether to provide his/her services at the World Trade Center/Ground Zero site(s) and/or other buildings or locations or portions thereof, on September 11, 2001 and thereafter, despite the dearth of sufficient protective clothing and equipment, the absence of other safety controls and the unreasonably hazardous working conditions and toxic exposures present at those places during the relevant times.

126.    As a result of the Defendants' herein described misrepresentations and/or active concealment of material information from the Plaintiff, the Plaintiff was injured and suffered damages in an amount exceeding the jurisdiction of all of the lower courts.

### E.    AS AND FOR A SEVENTH CAUSE OF ACTION: FOR THE DERIVATIVE PLAINTIFF

127.    Plaintiffs (Plaintiff) repeat(s), reiterate(s) and reallege(s) each and every other paragraph contained in this Complaint with the same force and effect as if set forth more fully at length herein and further allege the following.

128.    By reason of the foregoing, the Derivative Plaintiff is entitled to and as a result of the acts and omissions of the Defendant(s), its (their) servant(s), agent(s), employee(s), lessee(s), permitee(s) and/or contractor(s), set forth herein, has been deprived of the love, support, society, services, companionship and consortium of her husband (his wife), the Plaintiff herein.

129.    By reason of the foregoing, the Derivative Plaintiff seeks compensatory and exemplary damages in a sum to be determined by a jury.

130.

### iii.   PRAYER FOR RELIEF

WHEREFORE, judgment is demanded against the Defendant(s), jointly and severally, in

a sum to be determined by a jury, representing compensatory and exemplary damages.

### iv.   JURY TRIAL DEMAND

131.    Plaintiffs (Plaintiff) demand(s) that all issues of fact in this case be tried to a

properly empanelled jury.

WORBY GRONER EDELMAN & NAPOLI BERN, LLP
*Attorneys for Plaintiffs*
*Co-Liaison Counsel*

By: _____
        Brian D. Crosby (BC9543)

350 5th Avenue, Suite 7413
New York, New York 10118
(212) 267-3700

<u>ATTORNEY VERIFICATION</u>

BRIAN D. CROSBY, an attorney at law, duly admitted to practice in the Courts of the State of New York, affirms under the penalties of perjury that:

He is the attorney for the plaintiff(s) in the above-entitled action. That he has read the foregoing SUMMONS AND VERIFIED COMPLAINT and knows the contents thereof, and upon information and belief, deponent believes the matters alleged therein to be true.

The reason this Verification is made by deponent and not by the plaintiff(s) is that the plaintiff(s) herein reside(s) in a county other than the one in which the plaintiff's attorneys maintain their office.

The source of deponent's information and the grounds of his belief are communication, papers, reports and investigation contained in the file.


DATED:    New York, New York
          September 22, 2010


_____
        BRIAN D. CROSBY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IN RE: WORLD TRADE CENTER DISASTER SITE          21 MC 100 (AKH)
LITIGATION
-----------------------------------------------------------------X

=================================================================
COMPLAINT PURSUANT TO CMO 10
=================================================================
**WORBY GRONER EDELMAN NAPOLI & BERN, LLP**
*Attorneys for* : Plaintiffs
Co-Liaison Counsel
*Office and Post Office Address, Telephone*
350 5th Avenue, Suite 7413
New York, New York 10118
(212) 267-3700
=================================================================
To
Attorney(s) for
=================================================================
Service of a copy of the within                                            is hereby admitted.
Dated,
                          _____
                                        Attorney(s) for
=================================================================
PLEASE TAKE NOTICE:
? <u>NOTICE OF ENTRY</u>
         that the within is a (certified) true copy of a
         duly entered in the office of the clerk of the within named court on                 200__
? <u>NOTICE OF SETTLEMENT</u>
         that an order                                          of which the within is a true copy
         will be presented for settlement to the HON.                      one of the judges of the
         within named Court, at
         on                          200__              at                 am/pm.


         Dated,


                                                    Yours, etc.


                                        WORBY GRONER EDELMAN NAPOLI & BERN, LLP